All rise. Please be seated. As you've noticed, we're short on justice, but he will be, he's under the weather right now. But if you speak up, because we're recording. Okay? Ready to proceed with the next case is Interest of N.R. and C.R. Minors. Counselor, ready to proceed? Yes, Your Honor. Case number 513-0531. May it please the Court, my Honorable Co-Counsel, I'm here on behalf of the appellant, Ms. Angela Hunter. Some might think that this case started in 2013 when the disposition order was entered, or maybe it was in 2011 when the juvenile petition was filed. But actually this case started in 1620, when a small band of religious people came to this country for religious freedom. We now call them pilgrims, and they came here for the express purpose of having a place where they could exercise their religion freely. As a result of coming here, they suffered greatly. A lot of them died. Nine of their children died. But yet we remember them today as people who had a purpose, had a vision, and we honor them for their sacrifices that made our country the way it is today. That was not just a momentary blip in time. In 1791, the First Amendment to the Constitution was ratified. Well, if we viewed the events of the Salem Witch Hunts, would that have been bad parenting? There were a number of less than honorable events that happened between now and then. We don't want to totally look at that as an example, I guess. Well, I was thinking the Salem Witch Hunts is one of our less noble events in time. But, you know, overall, overall, I don't think our country has been a Salem Witch Hunt country. It's been a religious freedom country. So let's kind of focus on the positive there. Okay. So Congress will make no law respecting the establishment of a religion or prohibiting the free exercise thereof. We've had a lot of case law on that. I will turn your attention to 1993. Church of Lupimi Babalui v. City of Hialeah. That was a U.S. Supreme Court 508 U.S. 520 from 1993. That was a case in which a group wanted to move into the city of Hialeah in Florida and offer chicken sacrifices. The city didn't think that was such a great idea, so they passed an ordinance prohibiting that. Justice Anthony Kennedy wrote the opinion on that. And what he said, I think, is instructive. Religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection. Is that a case you cited in your brief? No, it's not. You know, you really can't argue cases that aren't cited in your brief unless you file a motion for leave to cite additional authority. Okay. Hold on. I'll just stick with the premise that religious beliefs need not be acceptable, logical, or consistent. And that's what we've got in this case. We've got three things that we have to look at. We have to look at what Ms. Hunter did, what she believed, and whether she was mentally ill or not. The state's attorney in Madison County filed a juvenile petition on November 21, 2011. Actually, two, one for each of the minors. And the minors were 14 and 7 at the time. In those petitions, they stated that the minor's mother has a history of mental illness and admitted to DCFS that she is inheriting Wal-Mart. They also said minor's mother believes the police, DCFS, and the governor are aspiring to take her children, and that she had a vision that the devil strangled the minor's sibling, thereby placing the minor at risk of harm. In this particular thing, there's no allegations that she did anything. It's a matter of belief. Later on, when we get down to the adjudication, the court made some findings, which, despite our best efforts to get the record together, we had an extreme amount of trouble with Madison County trying to get the record together. In my opinion, the record still is not complete. Let me ask you a question about that. Do you have the order of adjudication or the orders entered? Do you have that in the record? We have the orders entered initially. It became clear later on that the order, it's kind of a form order, and it says, see attached findings. Well, there were no attached findings, so we just assumed, well, they didn't exist. I believe that the state was able to find those attached findings and get them supplemented. My question is, what are the specific grounds upon which the trial court found the mother unfit? Okay. And was it more than one ground? Well, what the court said in the findings, which were supplemented later, the minor was subject to extreme periods of being grounded. Mother literally cut the shirt he was wearing off his back, and I will discuss these things further. She spoke of heriting Wal-Mart and the Wyndham Hotel. She spoke to the children regarding anointing doorways to keep demons out, threw away video games because she would believe the allow of the devil into the house. Her ex-husband testified that at some point previously she had told him that she had seen a demon dragging itself out of the water and that she had special powers such as astral projection. There's some allusion in there to the in-camera interviews. However, despite repeated requests to get all transcripts and all the records, those were never made available to us. And I don't know if they exist or not, but Madison County is not giving those to us. Okay. And I'm sorry, I said this is not a fitness case. The mother wasn't found unfit in this case. No, she was not. It's just an order of adjudication. Yeah. And that's what I was wondering is what was specific. Yeah. Okay. This is the order of adjudication. She was found fit. However, custody was given to her ex-husband with extremely restrictive visitation. You know, and I would argue, you know, the court does say in there that there was behavior that left the minor spearful and emotionally affected. However, we have no record of the in-camera interview. Therefore, I don't think that we can consider that because we have no way to review that. Was a record made and it just can't be located now? Or there just was no record made? We don't know. We don't know. Okay. We don't know. Excuse me. And, you know, has anybody filed a proposed bystander's report on any parts of this or? No, Your Honor. Excuse me. In the juvenile petition, the state seems to be acting on the idea that the minor's mother has a history of mental illness. This whole thing is kind of predicated on the fact that she has a history of mental illness. Therefore, these things are signs of her mental illness, signs of her inability to care for her children, signs that the children should be taken away from her. You know, if that's true, that's neither here nor there. The state needs to prove that. However, in this case, despite putting that in the juvenile petition, the state did not prove that she has a mental illness. The only psychological evaluation that she had said that she did not have a mental illness. The counselor that she saw ultimately found no signs of mental illness. Therefore, all those comments that she's making are part of her religious belief. You know, she has a religious belief in demons. You know, even though these beliefs don't have to be rational or commonly accepted, I would say probably that is a common belief, you know, in various churches in our community, that there are demons and that they do affect people. You know, I did a quick search of the New Testament of the Bible, and well over 50 times there were citations to demons or demon possession. So that's a very common belief. You know, they discussed, you know, what did the mother do? She talked to the children regarding anointing doorways to keep out demons. I don't think that people anointing doorways is something that's particularly odd. I think that's common in some churches in our communities. And how did it harm the children? You know, did it harm the children that she put oil on the door frame? No, not in any way. You know, this isn't fuel oil. This is, you know, some form of vegetable oil or some such thing. That's not harming the children. The court is also saying that it's finding that she threw away video games because she believed they would allow the devil into the house. You know, I don't think that throwing away your child's video games, you know, should be a basis for you losing custody of your children. You know, there are probably a lot of parents out there that would be well served by getting rid of some of the video games. You know, the other thing the court said is that Nick was subject to extreme periods of being grounded. You know, they didn't go into that. There was some testimony at one point that was 230 days. Not sure if that was at the outset it was 230 or if it was a matter of he was grounded. He did something else. He got grounded again. You know, that happens with teenagers. You know, they don't all shape up the way we'd like them to shape up. That's not a reason to have somebody's kids taken away from them. Another thing that they said was that Mother cut the shirt off his back. There's no evidence that Mother cut the son, that Mother scared the son. It was a mother-son confrontation over this Megadeth T-shirt that Mom did not find appropriate. Mom told him to take it off. Son said no. Mom told him again. Son said no. Mom said I'm going to cut it off you. Son said go ahead. So Mom cut it a little bit toward the rest of the way, and that was that. What was the saying on the shirt I forgot? I believe it was a band T-shirt from the band Megadeth, and there was some testimony that maybe it had a skull and crossbones or something of that nature on the T-shirt. So it was not just any old T-shirt. It was a T-shirt that was objectionable to the parent, you know, therefore she did that. You know, so in terms of what she did, she grounded her son. She cut the shirt off his back. She talked to the kids about anointing doorways, and she threw away some video games. That's what the court is saying is reason for her to lose her children. I would argue that that is not reason to lose children. Those are things that parents have to do to parent their kids sometimes. And obviously not every parent is going to parent the same way, but that is well above the minimum threshold for parenting. You know, in fact, you know, she's making an effort to discipline her children, making an effort to show that they grow up the way that they should grow up. The other thing that the court cites, you know, she believes that she's going to inherit a Walmart or a Wyndham Hotel. She believes that she saw a dream of dragging herself out of the water, and she believes that she has powers such as astral projection, which the state in their brief, you know, they state it a little bit differently. They say that she believes she could float in the air. I think that's their reference to astral projection. You know, it's one thing to have religious beliefs that other people don't accept. You know, we have, in this country, we have protections for that. We have made a decision that even if your next-door neighbor doesn't like the way you do things, we're going to protect that. In this case, those beliefs did not affect the children. You know, all we have is the bold statement that, you know, she had, you know, in the findings, the mother had delusional thoughts, which resulted in erratic behavior toward the minors, which lead to fearful and affective. In this case, we can tell that what the court finds to be irrational behavior is not something that other people would find to be irrational behavior. You know, grounding, annoying doorways, throwing away objectionable video games, those are not erratic behavior in most people's opinions. Therefore, we can see that there's a bias here, unfortunately, you know, against this woman's exercise of her religion. And that's why the case came down the way that the case came down. You know, and ultimately, the court did not find her unfit. Ultimately, the court did not find that she was mentally ill. You know, the statement's brief discusses that, you know, well, lay people can put in their comments and the court will consider that. That's fine. But they put in their comments, and every single comment related to a religious belief that she had that they didn't agree with, you know, and it's the court's job to kind of filter that out and realize, okay, this caseworker is not respecting this woman's pre-exercise of religion. She doesn't understand her religious culture. And therefore, we've got to take that with a grain of salt and... Tell me how her religious beliefs are tied in with her belief that she's inheriting Walmart. She believes that because of her faithfulness to God, you know, God is going to reward her for that. You know, in this case, she has a Bible verse, the meek shall inherit the earth. You know, and, you know, I have not discussed this with her in depth, and it's not in the record, so therefore it doesn't really matter. You know, we don't even know that her belief pertains to this lifetime. You know, she may see this as something happening, a future reward in heaven or in another life where she's going to be rewarded for being meek on this earth and that she's going to get, you know, hotels and Walmarts and that type of stuff. It was in the record at one point that, you know, she felt like this was just a passing comment and much too much of a debate of this. And I think it's important to realize that, you know, even though she made that comment, even though she had that religious belief, she didn't allow that to affect her children. You know, she didn't just sit around and let them starve because she thought this Walmart was coming through for her next week. Wasn't there some testimony that she'd said that more or less God had told her that she was going to inherit Walmart? Yes. Right. Yeah. Okay. Yeah, you know, it's a matter of her religious belief that she feels like God talks to people. And she didn't feel like she was the only one. There was testimony too that, you know, she and her mom believed that God talked to all Christians. You know. I mean, there's a line, isn't there, between religious beliefs and rational thought? There is a line. And that's really what the trial court had to be struggling with here to some extent. And he observed the witnesses, determined the credibility of the witnesses, the weight to be given evidence, and decided that this had gone beyond religious beliefs into irrational thought. Isn't that pretty much what the trial court decided? Well, that's where I disagree because the trial court had an expert witness. They had a psychologist that had done a psychiatric evaluation of Angela Hunter and had found that she did not have psychiatric problems. So based on that expert opinion, the court did not take that expert opinion's decision into consideration. And to be honest, the only way that the court can decide that it's mental illness, that it's actually irrational thought instead of a religious belief, would be to base it on that report. An expert is needed to tell the trial court that whether or not she really is going to inherit Walmart or whether God really told her that she's going to inherit Walmart. You need an expert to tell you whether or not that's a rational thought? Well, I don't think that any of us can say whether or not God told her that she's going to inherit Walmart. You know, none of us has picked up the phone and said, God, did you tell Angela Hunter that she's going to inherit Walmart? You know, obviously different religious groups feel like God is talking to them in different degrees. Some believe that God doesn't talk to people at all. Some people believe that he talks to them on a daily basis. So, you know, based on that, you know, could she have felt like she had a conversation with God in which he told her something like that? Could it have gotten all the way out of proportion? Sure. But I don't think it's for the trial court to say, well, just because you believe that God talks to you, you're irrational. Just because you believe God has promised you great things, you're irrational. You know, we're not too near the time yet either. I mean, Walmart could end up being franchised and she could end up being the housekeeper for the owner of one of them and she could get it. Who knows? You know, I don't think we could sit here and judge that at this point. But I think, you know, because the court has, you know, the only psychological testimony the court has, you know, the state had plenty of time in this case. They had two years to come up with whatever they wanted to come up with. The only testimony they have is from a psychologist who looked at her, who did psychological testing and found that she did not have disorders. So therefore, she did not have psychological disorders. You know, she also saw a counselor after that and the counselor did not find she had psychological disorders. You know, so those are her beliefs. They're personal beliefs. They're not affecting her children or her way of living. You know, and therefore, I believe under her constitution, she's entitled to those beliefs. You know, over and over again, it says that the minors were not harmed. They were fed. They were dressed. They were taken care of. You know, so, you know, whatever her personal beliefs are, she's not allowing it to affect the care and maintenance of her children. She's taking care of them and doing what she needs to do. You know, there was a, the, she saw a counselor, go back to this case. This case was initially, there was a report by DCFS that the minors were being neglected. DCFS investigated and ultimately decided this was unfounded. As part of that case, they wanted Angela and her son, who were having some parent-child conflict, to go to counseling. This was not required, but Angela agreed to it. It was that counselor that they saw that made the second report that ended up in the removal of the children from the home, ultimately. You know, that counselor made some statements like, well, she has tangential speech. Well, what is tangential speech? It means she's going off on tangents. You know, the first time, she said she's well-composed. She's well, you know, well-focused. She can talk. You know, everything's fine. Second time, you know, she appears and she's upset. You know, she's upset with the way things are going. She's upset with these things that are happening. Tangential speech just means she's going from one thing to another, one thing to another. You know, not going back to the original point. She's just going on and on with different things. You know, that's a communication disorder. That's not a mental health disorder. Ultimately, the counselor that made the report was, you know, upset because she was not coming back for more counseling. You know, she found that as a danger to the children, that she was not doing more counseling. And I think that, you know, we've got to consider, well, is that really a danger to the children or is that just this counselor's opinion? You know, she doesn't show any signs. You know, she doesn't say she has a mental health disorder. She just says she's upset. She's, you know. Let me just ask one other question. I mean, you point out in your brief that the record doesn't show any history of mental treatment. However, is it accurate that she refused to sign authorizations for anyone to get her medical records? At one point, I believe she did refuse to sign authorizations. And I think at that initial point, her plan was to get the records and give them to DCFS, and then things soured. But nobody ever got her past medical records. And nobody ever got her records. There was testimony from her that she did not have a mental health treatment. There's testimony from her mother about no previous mental health problems. And the ex-husband, who, you know, has no stake in the game. What is your thought? Has no stake in the game. Testified extensively. And if there had been mental health issues, I think he would have brought that up or it would have been brought up. Thank you, counsel. You have the floor. I have a question about the record. Is there parts of the record that possibly are missing? Not to my knowledge, Your Honor. If your question relates to the in-camera interviews. Yes. Is that in the file? The field? There is no transcript of the in-camera interviews. Was it transcribed? That I can't answer. So you don't know if any of the record is missing or not? That's correct. The issue, this issue was, as you know, not raised in the defendant's or the respondent's opening brief. Well, don't we have to argue off the record? If it would have been in the record, it might have been there. What we do have is the trial judge's factual findings, which do report some of what did transpire in those in-camera hearings. So there was an in-camera hearing, and if it was or was not recorded, we don't know? That's correct. Did you do any follow-up to determine if it was or wasn't? Let me think. I know that page 80 of the transcript contains the portion of the recorded hearing where they adjourned and went in camera. That wasn't the in-camera hearing. That wasn't the regular hearing. Right. But I just can't say whether, I mean, certainly I can represent as an officer of the court. If I believed that there were other transcripts available, I would have requested them. So that makes me think that I didn't see that. But I... Well, the court's concerned that it's missing. Something might be missing, and that's what we need. Right. Well, the burden's on the appellant to provide us with the record, not, you're the appellee, right? I understand that. But if the appellant can't get the record, it's refused, then I'm at a loss for where you go from there. I don't know that it's been refused. I can't speak to that. Okay. I just wanted to try to clear it up. Yeah. No, I'm sorry. I'm curious myself. I'd refer the court to page 80 of the record where they go into in camera, and if there were something to see, then I think that's where it would be. I'd like to note at the outset that the trial court was, as Your Honor, I think, said, cognizant of the concerns raised by the respondent here. In the factual findings, the court heard extensive testimony regarding the mother's religious beliefs, et cetera. While the court agrees that mother obviously may worship as she chooses, if her beliefs lead to extreme behavior and affect the welfare of her children, the court must intervene, and the court's factual findings proceed from there. And the court did find that the state had proved by a preponderance of the evidence that the children were neglected based on an injurious environment caused by mental illness. The state presented evidence that the respondent heard voices, had special and unique powers, and had inherited every Walmart in the world. The respondent questions the state's statement that she believed she could float in the air. That comes from page 5 of the people's answer brief, quotes the respondent's ex-husband. She told me that she had twice floated in her living room off of a couch. Additionally, the respondent questions whether a respondent believed that she would inherit, that she actually already had inherited Walmart, just that it was possible sometime in the future. This was a question that the circuit court specifically asked the respondent, and the respondent testified, and this was in a findings of fact that the court said, that she finally admitted that she does believe she will inherit Walmart. Is that based on a saying in the Bible, meek shall inherit the earth, or something like that? Didn't she testify to that? I saw that in the brief, I thought. She testified that there was a scriptural basis for the belief, yes. The state did also present evidence that the respondent had punished her son for believing that she would not inherit Walmart. And additionally, the court in the in-camera interviews found the children, and this is reflected in the findings of fact, fearful and emotionally affected by the delusional thoughts resulting in erratic behavior toward the minors. So based on this record, the findings of fact showed that the judge heard evidence from which he could conclude the existence of a mental illness by a preponderance of the evidence, and the respondent cannot meet the burden of showing that that finding was against the manifest weight of the evidence. As the respondent's contention that at the adjudicatory stage, the state must prove the existence of mental illness based on expert testimony and not based on lay testimony. However, there's no support for that contention. The quantum of proof required at termination stage, which we are not at, this is the adjudicatory stage, is that the state must prove the existence of mental illness by clear and convincing evidence through a licensed professional during a petition for termination due to mental illness. But that's not this stage, and so the respondent's demand for that quantum of evidence is premature and not supported by the text of the Juvenile Court Act. What the respondent's asking this court to do is to import that level of, that evidentiary requirement into the adjudicatory stage when the legislature chose to impose that burden on the state at the termination stage. And, of course, that goes against the, the respondent's request goes against principles of statutory construction and should be rejected. The respondent argues that the evidence, that there was evidence from a mental health professional presented at the adjudicatory hearing and that the court's finding was counter to that testimony. However, and this is discussed on pages 19 and 20 of the People's Answer Brief, that a report by Trimble, Dr. Trimble, was not admitted for purposes of adjudication. The court explicitly admitted that evidence and also the testimony of Counselor Stone only for purposes of disposition, not for purposes of adjudication. So the respondent cannot say that the court's adjudicatory order was against the manifest weight of the evidence based on the existence of that evidence because it was not admitted for purposes of that hearing. I would also like to note that the reply brief at page 4 narrows the issue on appeal to the question of whether lay opinions regarding mental illness were improper. And this, the respondent in the reply brief complains about allegedly objectionable testimony on pages 12, 26, 97, and 105. However, people examined the opening brief and in the opening brief only page 105 was mentioned as containing allegedly improper testimony. This argument that lay opinion testimony was the problem on these specific pages was not raised. People haven't had a chance to respond to it. These new claims are forfeited under Rule 341. Also, the respondent did not object to this allegedly improper evidence when it was offered. If she had, the State could have responded that it was being offered for other reasons, such as, for example, why DCFS acted as it did during its investigation. For example, on page 97, which is one of the pages mentioned by the respondent in the reply brief, DCFS investigator McHugh testified that she thought that mental illness was, quote, worth looking into, so she sought medical records. In other words, this is testimony where the DCFS investigator was explaining the course of the investigation, not offering lay opinions. Also, the reply on pages 1 and 3 mentions the existence of a factual mistake in the findings of fact. The circuit judge got the name of the family therapist wrong. However, all of the other features of that family therapist's testimony were correctly and accurately described. So, again, it's for the appellant to prove that the ruling was against the manifest way to the evidence, and more than speculation is required to make that showing. The reply brief at 5 says that the State's answer brief didn't make it clear, that the respondent refused to authorize the release of medical records. The answer brief at page 23 speaks of, quote, her refusal to authorize the release of medical records to DCFS. The reply brief at pages 6 and 7 says that the State failed to include in its answer brief the information that DCFS does not prohibit the respondent from finding her own counselor. The answer brief at page 16 and 17 says, quote, DCFS has no rule against the person obtaining his or her own evaluation as long as it is from an acceptable source. The respondent selected a source who was not an approved DCFS provider. And finally, the reply brief at 8 says that it's not fair that the court's order was based on evidence from in-camera interviews. I'd like to note that the Juvenile Court Act at 705 ILCS 405-2-18-4-D specifically provides for in-camera interviews of minors in these cases, and that the appellate court in a case cited by both parties, Brandon L., specifically found that the in-camera interview process does not deprive the respondent parent of due process, and the respondent hasn't shown why this case is different. Unless there are questions. Members, have any requests of the court? Thank you. Rebut. The State contends that the circuit court did pay heed to Angela Hunter's religious rights. You know, she says in there she's free to worship as she chooses, but if her beliefs relate to extreme behavior and affects the welfare of her children, the court must intervene. In this case, we've discussed the behavior. The child was grounded. He got an objectionable shirt cut off his back, and he got his video games thrown away. I don't find that to be extreme behavior, and I don't think most courts would. You know, other than this in-camera interview that we don't have, we don't have any hint that this affected the children and caused problems for them. We have a case report that said that the DCVS case dragging on had affected the son and left him emotionally affected. That's in the record. You know, back to this whole idea that Angela Hunter thinks she can float in the air. You know, the court said, well, we have this at page 5. This was the ex-husband's testimony. I think what we have here is we have a recounting that somebody made to their spouse of a vision that they had. You know, I don't think there was any evidence that the ceiling was torn open or that it went open and went back. You know, it sounds like she was telling him a vision where she felt like she was floating in the air. People have those visions. That's a matter of religion practice, and that spans a wide realm of religions. There's also some testimony that the son was punished because he did not believe the mother's, you know, thought that she was going to inherit Wal-Mart. That testimony came from the ex-husband who had the children and wanted to keep the children. Angela has testified that he was punished for, you know, having fits of anger. He had times where he stabbed school bus seats. He had other defiant behaviors, and she was punishing him for those. He didn't do his homework. He played his video games. That's why she punished him. She didn't punish him because he disbelieved her. He punished him because she needed to punish him. I would also posit that, you know, I think if the court did only consider the psychological testimony for the purposes of the disposition, I think that was error. I think the court should have considered that for the adjudication. The court had it available to it, and it was plainly relevant. For those reasons, I ask that this court please find that the decision of the court is against the benefit weight of the evidence and reverse this. And nothing else. Thank you. Thank you, counsel. The court will take a brief recess at this time.